UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,        )
                                 )
            v.                   )
                                 )        Case No. 2:20-cr-040-cr
TAYLOR HERRINGTON,               )
            Defendant.           )

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Now comes Taylor Herrington, by counsel and submits this motion to suppress evidence obtained without a warrant. The government's use of a subpoena to obtain thousands of retrospective records was a search and violated the Fourth Amendment. The evidence obtained as a result of the illegal search should suppressed as should the evidence later obtained as the fruit of an illegal search.

### Relevant Facts

Mr. Herrington incorporates by reference the procedural background and statement of facts provided in his motion to suppress (doc. 56). Specific to his motion to suppress records obtained via subpoena and the evidence derived therefrom are the following facts. On or about March 5, 2020, the government sent a grand jury subpoena to Apple that was returnable on March 8, 2019, by 9:30 a.m. The subpoena ordered Apple to produce:

> All customer or subscriber information for the email addresses:
> taylor_herrington26@icloud.com
> And/ or for any related account(s), that fall within any of the following
> categories for any devices associated with the account(s):

   a)name(s), address(es), e-mail address(es), telephone number(s), and username (s);

   b)records of session times and durations;

   c)length of service (including start date), types of services utilized, and devices associated with the subscriber's account(s);

   d)telephone or instrument number or other subscriber number or identity [sic], for any device associated with the account, including any temporarily assigned network address such as an Internet Protocol(IP) address; Port numbers; IMEI; Apple Device ID, MAC address(es);

   e)means and source of payment for such service (including any credit card or bank account number); and

   f) Apple IP logs for any device assciated [sic] with the account.

According to discovery produced by the government, Apple provided four spreadsheets with account and activity information for the taylor_herrington26 account. Apple produced a fourth file that is not accessible.

The first spreadsheet, titled iCloud Logs, contains a time-stamped log of instances in which the taylor_herrington26 account accessed various iCloud services along with the IP address from which the services were accessed. The file covers almost 13 months of records, from February 11, 2019 to March 5, 2020, and runs to some 12880 entries.[1] The second spreadsheet contains basic account details. The third spreadsheet, titled iTunes data, contains a series of sheets with different time-stamped entries for the subscriber's iTunes activities. One sheet, "iTunes Updates," contained approximately 1174 entries dealing with iTunes updates. The entries were time-stamped and included an IP address and the associated global unique id. The entries cover a year-long period from March 2019 to March 2020. Another

---

[1] The spreadsheet indicates that the records cover the period March 5, 2019 to March 5, 2020, but the entries only cover the period from February 10, 2020 to March 5, 2020.

sheet, iTunes Transactions, covered a similar time frame and included some 65 entries that were time-stamped and included an IP address as well as a global unique id. The, iDMS Signons sheet included some 4900 entries covering the period March 9, 2019 to January 22, 2020. The logs documented what Apple service was accessed at the time and provided an IP address for the activity. The last sheet, My Apple ID and iForgot data, provided approximately 160 entries over the course of the same 1-year period in which these services were utilized. The entries were timestamped and included the IP Address from which the services were accessed.[2]

The final spreadsheet, GCRM Data, dealt with "[i]nstalled product details related to" the subscriber ID. The spreadsheet contained details about the Apple products utilized by the taylor_herrington26 account and specified that since 2018, a 65gb, silver iPhone X; and Apple watch, and a "loaner" iphone 8 had all been used by the subscriber. The spreadsheet provided serial numbers for the products as well as activation dates for two of the devices.

The government's subsequent investigation makes it clear that the information obtained through this subpoena was useful. Thus, the government's August 20, 2020 warrant for information associated with the taylor_herrington26 account indicates that the government used the subscriber information to locate Mr. Herrington in Philadelphia, Pennsylvania. The same warrant also documents the fact that the government uses IP addresses, either alone or in combination with other information to understand "who has used or controlled the account." Doc. 22-

---

[2] The iTunes Match and Gamecenter sheets were empty.

3 at 17. The warrant application explains that the fact that "every device has unique hardware and software identifies, because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account." *Id.* Importantly, this information, obtained without a warrant, "also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation." *Id.*

## Argument

### Mr. Herrington Had a Protected Privacy Interest in the Detailed Information Sought and Obtained By the Government From Apple

#### A. The detailed information sought and obtained by the Government was impermissibly subpoenaed in violation of the Fourth Amendment

It is well established at this point that the government undertakes a search when it intrudes on an expectation of privacy that society is prepared to recognize as reasonable. *Kyllo v. United States*, 533 U.S. 27, 33 (2001). The reasonable expectation of privacy inquiry has two components, an individual must have a reasonable expectation of privacy in the space; that is, "a subjective expectation of privacy that society is prepared to accept as objectively reasonable." *United States v. Hayes*, 551 F.3d 138, 143 (2d Cir. 2008). In *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018), the Supreme Court held that an individual maintains a

legitimate expectation of privacy in the record of his or her physical movements as captured through cell-site location information.

As new technology has dramatically lowered the cost of government surveillance and increased the government's access to private information, the Supreme Court has stressed that the reasonable-expectation-of-privacy inquiry must "assur[e] preservation of that degree of privacy against government that existed" prior to the advent of the new technology in question. *United States v. Jones*, 565 U.S. 400, 406 (Scalia, J.) (alteration in original); *id.* at 420 (Alito, J., concurring in the judgment); *Kyllo*, 533 U.S. at 34; *see also Carpenter*, 138 S. Ct. at 2217 ("Mapping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts."); *Riley v. California*, 134 S. Ct. 2473, 2490 (2014) (requiring a warrant to search contents of cell phones seized incident to arrest in order to preserve degree of privacy enjoyed before invention and pervasive use of cell phones). Indeed, the ease with which detailed records are created and can be accessed and leveraged by the government weighed heavily in the Court's decision concluding that historic cell-site location information was protected. *Carpenter*, 138 S. Ct. at 2217-2218.

For example, in *United States v. Jones*, five Justices agreed that individuals have a reasonable expectation of privacy in "longer term GPS monitoring in investigations of most offenses." *Jones*, 565 U.S. at 430 (Alito, J., concurring in the judgment); *id.* at 415 (Sotomayor, J., concurring). The Court reached this result because GPS monitoring of a car tracks "every movement" a person makes in that

vehicle, *id.* at 430 (Alito, J., concurring in the judgment), and generates extremely sensitive and private information that "enables the Government to ascertain, more or less at will, [people's] political and religious beliefs, sexual habits, and so on," *id.* at 416 (Sotomayor, J., concurring). The Court's decision came notwithstanding the fact that this information would have been largely immune from search if accomplished through other means. Historically, and even today, the government could have tasked a team of agents with surreptitiously tailing a suspect. However, doing so "for any extended period of time was difficult and costly and therefore rarely undertaken." *Id.* at 429 (Alito, J., concurring in the judgment). As a result, "society's expectation has been that law enforcement agents and others would not—and in general could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." *Id.* at 430; *Carpenter*, 1238 S. Ct. at 2217. It was the advent of new and easily applied technology that made the difference in terms of what the government could easily accomplish and what expectation of privacy society was willing to recognize as reasonable.[3]

    In *Carpenter v. United States*, the Supreme Court concluded that historic cell-site location records ("CSLI") were protected for many of the same reasons. In *Carpenter*, several factors about the information collected allowed the government

---

[3] To a similar effect is *Riley v. California*, 134 S.Ct. 2473 (2014), where the Supreme Court declined to extend the search-incident-to-arrest doctrine to cell phones on an arrestee's person: "A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom." *Id.* at 2489.

to generate a "detailed and comprehensive record of a person's movements," which the Court concluded deserved protection. 138 S.Ct. at 2217. The CSLI was widely retained and easily obtained by authorities, the CSLI could be obtained retroactively and could cover long periods of time, CSLI provides relatively precise location data, cell phones constantly generate CSLI without action on the user's part, and cellphones are ubiquitous in modern life. Many of the same concerns that were present in *Jones* and *Carpenter* are present in this case as well.

Notwithstanding the parallels between *Carpenter* and cases involving detailed account information and time-stamped IP records, a number of courts, including this Court, have denied motions to suppress such records obtained via subpoena. *United States v. Germain*, 2019 WL 1970779 at *3 (D.Vt.) (citing cases). By contrast, other courts have recognized the parallels and concluded that the seizure of such records "present[s] a substantial unresolved question as to whether the location information conveyed by IP address information is sufficiently similar in kind to that conveyed by CSLI to warrant the application of *Carpenter*." *United States v. Kidd*, 394 F. Supp. 3d 357, 366 (S.D.N.Y. 2019). The conclusion of the court in *Kidd* is appropriate given the evolution of the government's investigative practices in recent years as is explained below.

In *Germain*, 2019 WL 1970779 at 4, this Court denied a similar claim and explained that "that an individual has no reasonable expectation of privacy in their IP address because such information "does not reveal Defendant's physical movements or the location of his cell phone." But this conclusion is belied by the

government's own sworn statements about its investigative practices. In the
warrant seeking information regarding the taylor_herrington26@icloud.com
account, investigators swore that the information at issue here "allows investigators
to understand the geographic and chronological context of access, use, and events
relating to the crime under investigation." Doc. 22-3 at 17. In full, the authorities
explained that:

> [B]ecause every device has unique hardware and software identifiers,
> and because every device that connects to the Internet must use an IP
> address, IP address and device identifier information can help to
> identify which computers or other devices were used to access the
> account. Such information also allows investigators to understand the
> geographic and chronological context of access, use, and events relating
> to the crime under investigation.

*Id.* Thus, by their own admission, the records seized without a warrant can be used
"to understand the geographic and chronological context of access, use, and events
relating to the crime under investigation" as was the CSLI. There are additional
parallels as well.

Like the "detailed, encyclopedic, and effortlessly compiled" CSLI records, the
information obtained in this case amounted to thousands of records that covered
many months. Also like the GPS location information or CSLI information, the
information produced by Apple is information that, prior to the digital age, society
expected "that law enforcement agents and others would not—and indeed, in the
main, simply could not—secretly monitor and catalogue every single movement of
an individual's car for a very long period." *Carpenter*, 138 S. Ct. at 2217 (quoting
*Jones*, 565 U.S. at 430).

Further, the records produced in this case are similar to the CSLI records in that they are produced constantly, whenever a device is used. *Carpenter*, 138 S.Ct at 2218. For example, the 11,000 entries that were part of the iCloud IP address log produced by Apple were compiled at the rate of several hundred per day. In this case, the Apple records applied not just to one device, but appear to have been produced anytime an Apple device or service were used by the account holder.

Like the CSLI records, the records in this case were also retrospective. The Supreme Court explained that:

> [T]he retrospective quality of the data here gives police access to a category of information otherwise unknowable. In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection. With access to CSLI, the Government can now travel back in time to retrace a person's whereabouts, subject only to the retention polices of the wireless carriers, which currently maintain records for up to five years. Critically, because location information is continually logged for all of the 400 million devices in the United States— not just those belonging to persons who might happen to come under investigation—this newfound tracking capacity runs against everyone. Unlike with the GPS device in *Jones*, police need not even know in advance whether they want to follow a particular individual, or when.

*Carpenter*, 138 S. Ct. at 2218. The records in this case give the authorities access to retrospective data that provide physical as well as digital location information. This type of detailed information raises clear Fourth Amendment concerns:

> Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years, and the police may—in the Government's view—call upon the results of that surveillance without regard to the constraints of the Fourth Amendment. Only the few without cell phones could escape this tireless and absolute surveillance.

*Carpenter*, 138 S. Ct. at 2218. That *Carpenter* requires suppression of the records produced pursuant to the subpoenas in this case is confirmed by the Second Circuit's decision in *United States v. Zodhiates*, 901 F.3d 137 (2d Cir. 2018), *cert. denied*, 2019 WL 176493 (Feb. 25, 2019).

*Zodhiates* applied *Carpenter* to a case involving cell-phone billing records that provided only generalized location information. In that case, the Second Circuit explained that the information produced was "detailed call information" that included "service location" information for each call. *Id.* at 141. That "service location" information "showed the general vicinity of the cell phone when the call was made or received, such as a county name, but did not contain details about precisely where in the general area the phone was located." *Id.* at 141. Instead of concluding that Zodhiates' Fourth Amendment claim lacked merit, the Second Circuit rejected the claim on good faith grounds. *Id.* In so doing, the Second Circuit affirmed that even location information that revealed "the general vicinity" of the user over time was protected Fourth Amendment information. This is in keeping with the decision in *Carpenter*, where the CSLI records at issue did not provide GPS-levels of precision. 138 S.Ct. at 2219 (noting also at 2211 that the precision of the CSLI "depends on the size of the geographic area covered by the cell site"). In addition to the more precise digital location information, this is precisely the type of geographic location information produced in response to subpoenas in this case.

The subpoenas in this case caused the providers to disclose large quantities of detailed, retrospective data. IP address provide both an exact digital location and

resolve to a geographic location.  By the government's admission, the IP addresses

provided in a log can provide a picture of an individual's physical movement

overtime.  Indeed, the government's sworn statement in the warrant that it later

sought explained that

> [B]ecause every device has unique hardware and software identifiers,
> and because every device that connects to the Internet must use an IP
> address, IP address and device identifier information can help to
> identify which computers or other devices were used to access the
> account. Such information also allows investigators to understand the
> geographic and chronological context of access, use, and events relating
> to the crime under investigation." Doc. 22-3 at 17.

In this case, the authorities received tens of thousands of time-stamped IP address

entries.  Such a detailed IP log would tend to reveal a picture of where the customer

used the services over time.  As in *Zodhiates*, the government can use this type of

information to tie an individual to a digital or physical location.  *Id*. at 142.

The records produced in this case reaffirms that cell phones, other devices, and

services produce voluminous records when in use.  Given the ubiquity of cell phones

and other devices, electronic communications, and internet computing services,

society expects that the government cannot obtain the detailed information at issue

as well as records regarding the identity of the customer and the devices utilized

without a warrant.  The information produced without a warrant in this case should

be suppressed as should any evidence subsequently obtained through use of the

information gleaned from these companies as it is the fruit of an illegal search.[4]

---

[4] The same would be true if judged under a trespass theory:  The provider at issue in this
case maintained accounts on behalf of users.  The establishment of accounts by the user
with the service providers included the express, implied, or understood agreement to hold

### B. The third-party doctrine does not apply to this case.

While the government may offer that the third-party doctrine applies here and that *Smith v. Maryland*, 442 U.S. 735 (1979), governs Mr. Herrington's claim. This is not the case as the Court's decision in *Carpenter* makes clear. *Smith v. Maryland* involved the use of a pen register to record the phone numbers dialed from the defendant's home. 442 U.S. at 737. Ultimately, the Supreme Court ruled that the use of a pen register for several days to capture the telephone numbers a person dials does not implicate a reasonable expectation of privacy. *Id.* at 740-42. The Court's ruling was based on the minimal degree of invasiveness involved in the surveillance and the Court noted the "pen register's limited capabilities" and that "a law enforcement official could not even determine from the use of a pen register whether a communication existed." *Id.* at 741-42 (citation omitted). There was no reasonable expectation of privacy because when dialing a phone number, the caller "voluntarily convey[s] numerical information to the telephone company." *Id.* at 744. That this limited information is conveyed, the Court explained, is evident to society because individuals have to "convey" phone numbers to the phone company in the process of dialing them, and because "they see a list of their long-distance (toll) calls on their monthly bills." *Id.* at 742.

---

and safeguard the information. At a minimum, therefore, these service providers acted as bailees of the information associated with those accounts. *Carpenter*, 138 S.Ct. 2268 (Gorsuch, J., dissenting). The disclosure of the information in and associated with the accounts was a search and violated the Fourth Amendment.

Unlike the bare telephone numbers collected over 1-2 days in *Smith*,[5] the government here was able to obtain voluminous records from Apple without a warrant. The information obtained included historical IP address logs that reveal digital and geographic location information over time. As the *Carpenter* Court succinctly explained, any attempt to apply the third-party doctrine fails to account for the sea change in information collection brought about by the digital era:

> The Government's position fails to contend with the seismic shifts in digital technology that made possible the tracking of not only Carpenter's location but also everyone else's, not for a short period but for years and years. Sprint Corporation and its competitors are not your typical witnesses. Unlike the nosy neighbor who keeps an eye on comings and goings, they are ever alert, and their memory is nearly infallible. There is a world of difference between the limited types of personal information addressed in *Smith* and *Miller* and the exhaustive chronicle of location information casually collected by wireless carriers today. The Government thus is not asking for a straightforward application of the third-party doctrine, but instead a significant extension of it to a distinct category of information.

138 S. Ct. at 2219. Just as in *Carpenter*, the application of the third-party doctrine would represent a significant expansion of the doctrine to a case involving the disclosure of a vast quantity of detailed, retrospective information. *Carpenter* makes it clear that this is not appropriate.

## C. The good faith exception will not save a warrantless investigatory search.

---

[5] *Smith* makes it clear that the pen register was installed on March 17 and that it was a call placed that day that caused police to seek, obtain, and execute a search warrant that led to the defendant's arrest and identification in a lineup held on March 19. 442 U.S. at 737.

In *United States v. Leon*, 468 U.S. 897, 922 (1984), the Supreme Court held that suppression is not justified where evidence was seized pursuant to a warrant that was later determined to be unsupported by probable cause, but where officers acted in objectively reasonable reliance on the warrant's apparent validity. Later decisions, such as *Davis v. United States*, 564 U.S. 229, 241 (2011), or *Illinois v. Krull*, 480 U.S. 340, 356-57 (1987), apply the good faith exception where agents acted in reasonable reliance on existing law that is later overturned (in *Krull* a state statute authorizing the warrantless search; in *Davis*, judicial precedent that was later overturned). Nothing in *Leon* suggests that the rule should apply where there is no statute or law authorizing the warrantless search.

## Conclusion

For the reasons stated above, Mr. Herrington respectfully requests that the Court issue an order suppressing the information obtained without a warrant from Apple. Mr. Herring further requests that the Court suppress the evidence subsequently obtained through use of the information gleaned from these subpoenas as the fruit of an illegal search.

Dated: April 6, 2021.

MICHAEL L. DESAUTELS

Federal Public Defender

By:  */s/ Elizabeth K. Quinn*___
Elizabeth K. Quinn
Assistant Federal Public Defender

Office of the Federal Public Defender
District of Vermont
95 Pine Street, Suite 150
Burlington, Vermont 05401
(802) 862-6990
Counsel for Taylor Herrington